Albert L. Allen Company, Inc. v. Commissioner.
Albert L. Allen Co. v. Commissioner
Docket No. 112025.
United States Tax Court
1944 Tax Ct. Memo LEXIS 37; 3 T.C.M. (CCH) 1246; T.C.M. (RIA) 44381; November 25, 1944
*37 Sanford D. Beecher, Esq., for the petitioner. Myron S. Winer, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies for calendar years as follows: 1937
$ 492.36
1938
2,298.92
1939
1,794.41
The sole issue submitted is whether the petitioner was availed of during the taxable years involved for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting the earnings or profits to accumulate instead of being distributed. Many of the facts were stipulated. Others were developed from testimony and exhibits. Findings of Fact Petitioner is a business corporation organized in 1919 under the laws of Pennsylvania with registered offices in Harrisburg, Pennsylvania. Its income and excess-profits tax returns for the taxable years were filed with the collector of internal revenue for the first district of Pennsylvania. The purposes for which the petitioner was organized, as set forth in its charter, are as follows: "2d. Said corporation is formed for the purpose of the transacting of a general insurance agency, brokerage and service business in all of its branches, *38 including all inspection, auditing, adjusting and other service incident to, related to or connected with insurance practice; and to transact all such business as is necessary or incident thereto." Under the Pennsylvania Workmen's Compensation Act an employer may comply with that law by carrying compensation insurance in a qualified or mutual insurance company, or in the State Workmen's Insurance Fund, or by self-insurance. To be permitted to be a self-insurer the employer must meet certain specified requirements. Petitioner, since its incorporation, has engaged in servicing self-insurers under said Act, and operating a general insurance or brokerage business. During the taxable years the total commissions received by the petitioner on its insurance business and the break down as between reinsurance and other insurance is as follows: Com-
Other
Total
missions
insurance
Com-
on Rein-
Com-
missions
surance
missions
1937
$10,934.36
$3,239.88
$7,694.48
1938
13,262.25
6,669.81
6,592.44
1939
14,423.52
6,933.29
7,490.23
Petitioner performed the services required by its standard service contracts entered into with its clients who are authorized *39 to self-insure under the Workmen's Compensation Act. That contract, inter alia, provides: "FOURTH This agreement may be terminated by either party by giving to the other party three months written notice in advance of the date upon which such cancellation is to become effective, or without notice in case the Self-Insurance Permit of the First Party should be revoked. "FIFTH It is agreed that in case changes are hereafter made in the Pennsylvania Workmen's Compensation Act or the Occupational Disease Compensation Act that substantially alter the basis of this agreement and materially affect the nature and amount of service to be rendered by the Party of the Second Part hereunder, consideration shall be given by the parties hereto to such changed conditions. "SIXTH Proper consideration is to be granted either party of this agreement due to either increase or curtailment of operations, when the change may be of sufficient importance to create a material difference in the amount of service required." Petitioner was organized in 1919 primarily by Albert L. Allen, who has been its president and treasurer since its organization. Allen had been actively engaged in *40 the workmen's compensation field since 1912. In 1912 he participated in setting up the system in Massachusetts, and about two years later, the system in the State of New York, and in 1915, the system in the State of Pennsylvania. Allen thereupon became the assistant manager of the Pennsylvania State Workmen's Insurance Fund and was generally responsible for organizing and coordinating the entire Pennsylvania system. At the time Allen resigned that position in 1919 he was receiving an annual salary of $6,000. The authorized capital stock of the petitioner was 150 shares of common stock having a par value of $100 per share. Of these, 85 shares were originally issued to Albert L. Allen and, between 1919 and 1921, 29 additional shares were issued to other persons. By 1932, through redemptions and cancellations, there were only 98 shares outstanding, all of which were owned or controlled by Allen. All of the issued and outstanding stock was issued for cash equal to the par value, except 75 shares issued to Allen in 1919 for good will. From 1920 to 1930, $1,500 of this good will item of $7,500 was written off and during 1931 to 1940, inclusive, the balance of $6,000 was written off at *41 the rate of $600 per annum. No dividends were paid between 1919 and December 31, 1939. During the taxable years petitioner employed from 20 to 23 persons. The total payroll during those years, including officers' salaries, was as follows: Albert
Raymond
L. Allen
C. Baker
Pres.
Office
Year
Total
& Treas.
Manager
1937
$29,720.14
$10,450.00
$3,862.50
1938
35,266.92
14,000.00
3,950.00
1939
37,103.53
14,200.00
4,185.00
In 1925, Albert L. Allen organized the Allen Registry Bureau, a sole proprietorship. The business of the Bureau is low rate limited liability accident insurance written on a mass scale through newspapers and automobile clubs. Two insurance companies are represented by the Bureau. One issues low rate limited policies covering automobile accidents only. Allen is responsible for all the business done through automobile clubs, which is approximately the Bureau's entire gross volume. The other insurance company issues a low rate limited policy covering every type of accident. The business done through newspapers is obtained by a representative operating on a commission basis. The work of the Bureau consists of receiving accident reports, *42 checking the reports to ascertain if the accident is covered, sending out a form to ascertain when disability ceases, receiving the final report and preparing and forwarding the voucher. The premium is received by the Bureau, which it remits monthly to the proper insurance company. The Bureau does not conduct investigations. The Allen Registry Bureau, late in 1937, purchased a two story brick building with basement at 319 North Second Street in Harrisburg, Pennsylvania. The building was remodeled to accommodate offices for both the Bureau and the petitioner. The total cost of the building, as remodeled, was about $18,000 and was occupied in February 1938. For the year 1937 the total rent paid by the petitioner for offices then occupied by it and the Bureau was $2,820. For the 11 months in 1938 the petitioner paid rent to the Bureau for space in the latter's building in the amount of $2,317.50, and for the year 1939, the sum of $3,075. The amount of rent paid by the petitioner to the Bureau was based on the opinion of Miller Bros., a local real estate firm, who appraised the building and on the rate of $1 per square foot which the petitioner paid at its previous location. Petitioner *43 was paid a service charge by the Bureau to reimburse it for services of personnel, rent and other expenses incurred by the petitioner on behalf of the Bureau for the years 1929 to 1937, inclusive, as follows: 1929
$8,400
1930
7,200
1931
7,200
1932
7,200
1933
6,400
1934
$5,450
1935
5,400
1936
3,900
1937
3,600
The service charge paid by the Bureau to the petitioner in 1939 and for the last 11 months of 1938 did not include rent but did include the same other elements of expense. The payments in those periods were as follows: 1938
$4,600
1939
4,800
In 1937 all of the petitioner's clients selfinsuring under the Workmen's Compensation Act were bituminous coal mining companies. All of these companies continued under the Act as amended in 1937. Petitioner during the taxable years acquired four commercial accounts. As of the end of 1939 these commercial clients were paying the petitioner the following monthly charges for its self-insurance service: Hy-Grade Sylvania Corp
$ 60.00
Lukens Steel Co.
350.00
Phoenix Iron Co.
250.00
Phoenix Glass Co.
65.00
Total
$725.00
Petitioner realized net income during the taxable years 1937, 1938 and 1939 as follows: *44 Income from:
1937
1938
1939
Insurance commissions
$10,934.36
$13,262.25
$14,423.52
Services to self-insurers
36,018.35
46,405.00
46,975.00
Compensation forms
534.29
909.82
946.29
Claims adjustments
480.99
626.57
497.82
Income from investments not related to peti-
tioner's business (dividends and interest)
1,953.09
2,311.14
1,974.72
Capital gains and (losses)
149.61
(107.48)
165.65
Total Income
$50,070.69
$63,407.30
$64,983.00
Expenses: Officers' salaries
$14,312.50
$17,950.00
$18,385.00
Salaries and wages of employees
15,391.10
17,274.90
18,712.54
Other expenditures
16,659.97
17,826.48
19,880.51
Total Expenses
$46,363.57
$53,051.38
$56,978.05
Net Income
$ 3,707.12
$10,355.92
$ 8,004.95
The balance sheets of the petitioner for the
taxable years 1937, 1938 and 1939 disclose data
as follows: Assets
1937
1938
1939
Cash
$ 6,136.76
$10,119.63
$ 9,773.62
Accounts Receivable
8,876.46
9,075.16
11,822.24
Notes Receivable
1,322.69
1,322.69
1,322.69
Total Current Assets
$16,335.91
$20,517.48
$22,918.55
Furniture and Fixtures
1,776.00
2,225.00
2,165.00
Good Will acquired with capital stock
7,500.00
7,500.00
7,500.00
Total assets used in connection with business
$25,611.91
$30,242.48
$32,583.55
Investments in securities not used in connection
with business
40,935.99
48,339.40
50,605.73
Total Assets
$66,547.90
$78,581.88
$83,189.28 Liabilities
Accounts Payable
$ 6,541.08
$ 8,267.78
$ 6,667.11
Net Worth
60,006.82
70,375.10
76,522.17
Allocation of Net Worth: Capital Stock
$ 9,800.00
$ 9,800.00
$ 9,800.00
Accumulated earnings and profits
$50,206.82
$60,575.10
$66,722.17
*45 The net income of the Allen Registry Bureau reported as profit from business on Mr. Allen's personal income tax returns was as follows: Year
Amount
1928
$16,589.65
1929
17,887.07
1930
14,278.12
1931
19,744.17
1932
13,055.97
1933
11,864.45
1934
$11,007.07
1935
15,224.81
1936
19,254.14
1937
19,949.28
1938
18,735.63
1939
22,514.49
The business of the Allen Registry Bureau was handled directly by the petitioner. The total net income of Albert L. Allen from all sources during the taxable years was as follows: 1937
$31,787.56
1938
30,271.03
1939
34,649.63
If section 102 net income of the petitioner had been distributed to Albert L. Allen in the taxable years his Federal income tax liability would have been increased as follows: 1937
$ 754.95
1938
2,199.62
1939
1,799.52
Total
$4,754.0 Petitioner during the taxable years made no advances or loans to Albert L. Allen. Petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of the business during the taxable years 1937, 1938 and 1939. Petitioner, during the said taxable years, was availed of for the purpose of preventing the imposition of the surtax upon its *46 shareholders through the medium of permitting earnings and profits to accumulate instead of being divided or distributed. Opinion The sole issue is whether the petitioner was availed of during the taxable years for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting earnings and profits to accumulate instead of being divided or distributed. [1] The petitioner admits the accumulation of its earnings and profits. It argues, however, that the amount of the accumulation was not unreasonable in view of the nature of its business and the constant threat to the continuance of its most productive line. The petitioner was organized by Albert L. Allen for the purpose of operating a general insurance agency. Its principal revenue was derived from its contracts to service employers who were self-insuring under the Pennsylvania Workmen's Compensation Act of 1915, and from commissions on excess insurance placed by such employers. The principal reason assigned by the petitioner as justifying the accumulation of its earnings and profits was the fear it entertained that unfavorable legislation might be enacted which would result in the termination *47 of his servicing contracts with self-insuring employers. Evidence was presented to the effect that the amendments to the Workmen's Compensation Act in 1937 caused the situation to become very confused and chaotic. These amendments enlarged the disabilities covered and increased the benefits. Petitioner became apprehensive that the increased cost to its clients resulting from the amendments would cause them to reject the Act and terminate its contracts. Furthermore, proof was introduced that the petitioner feared that legislation would be enacted requiring employers to insure in a monopolistic State insurance fund. In the event of either of these contingencies arising the petitioner feared there would be termination of its servicing contracts and a consequent loss of its principal revenue. Moreover, the petitioner argues that it would be legally bound to continue its servicing of existing claims arising under its contracts. This, says the petitioner, would require it to retain a staff of trained and experienced insurance employees to do the work, for which it would not receive commensurate return. The claim is thus made that to meet these possible contingencies the petitioner was required *48 to maintain a comparatively large surplus. The argument is made that the surplus accumulation was not only not greater than was reasonably necessary to meet petitioner's needs, but that it was probably inadequate for such purposes. As we construe the petitioner's contracts with its self-insuring employers, there was no legal obligation upon the petitioner to continue servicing the existing claims in the event the contracts were terminated. Nor are we convinced that the petitioner was under a moral obligation to continue servicing existing claims at a financial loss to itself. Paragraphs "Fifth" and "Sixth" of the contracts were clearly intended to cover the possible occurrence of such contingencies. It may be, as the president of the petitioner testified, it would be desirable from a "good will" standpoint to continue servicing the existing contracts despite a resulting loss. However, such a reason could not be regarded as justification for an accumulation of earnings and profits which otherwise would be considered unreasonable within the purview of the applicable revenue statutes. *49 Nor does the evidence satisfy us that the reason the petitioner did not distribute its earnings and profits in the taxable years was because of any fear of unfavorable legislation in the Workmen's Compensation field. Although the record shows that because of the amendments in the 1937 Act, the anthracite coal operators rejected the Act as unfavorable to them, none of the bituminous operators elected to reject it. All of the petitioner's clients, with whom it had servicing contracts, were bituminous operators. All continued to operate under the new Act. The apparent reason for the rejection of the Act by the anthracite industry is the fact that the hazards in hard coal mining are greater than in soft coal mining. Hence, the increased coverage and benefits provided by the 1937 amendments were more burdensome upon the anthracite operators. This fact was well known to the petitioner. The 1937 Act did not adversely affect the petitioner. In fact its revenue was increased because the added benefits under the Act required additional service for which the petitioner was fully compensated. This record reveals Allen as an intelligent person - particularly in the field of compensation insurance. *50 Certainly the agitation for the establishment of a monopolistic State Insurance Fund by Pennsylvania had not become sufficiently voluble or tangible before 1940 to support any real and substantial fear on his part of its success. The occasional rumors of the possible establishment of such a policy during or even before those years, in our opinion, did not have any material influence upon the petitioner's determination not to distribute its earnings or profits. The petitioner is a personal service corporation. Of its 98 shares of outstanding capital stock, 96 are owned by its organizer and president, Albert L. Allen. Of these 96 shares, 75 were issued to him for good will and the balance for cash. The company has operated at a profit since 1929. It has never paid any dividends, although the salary of Mr. Allen has been increased from $4,800 in 1929 to $14,200 in 1939. If the petitioner, in fact, believed its accumulations were inadequate how can it justify the large increases in the salary paid to its president? Petitioner's balance sheets for the taxable years show the accumulated earnings and profits and investments in securities not used in its business to be as follows: Investments
Earnings
not used in
Year
& Profits
the business
1937
$50,206.82
$40,935.99
1938
60,575.10
48,339.40
1939
66,722.17
50,605.73
*51 Although the primary purpose of a corporation is usually to earn and pay dividends, Allen testified that he never intended that the petitioner should pay dividends. We think this declared purpose not to pay dividends in itself goes far toward nullifying the effect of Allen's testimony that in permitting the petitioner's earnings and profits to accumulate he was not motivated by a purpose to avoid surtax. Has the petitioner established by a preponderance of the evidence that its earnings were not permitted to accumulate beyond the reasonable needs of the business? This question must be determined upon the particular facts disclosed by this record. Helvering v. National Grocery Company, 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932. Petitioner relies on our decision in the case of L. R. Teeple Company, 47 B.T.A. 270. We there found from the entire record the ultimate fact that the accumulated surplus during the taxable years was not beyond the reasonable needs of the business. We further expressed the view that the record demonstrated that the taxpayer's fear that it might lose its sole customer was real and not remote or unproven. We have already observed *52 that we were not convinced by the evidence here that the alleged threats of unfavorable legislation were the motivating reasons causing the petitioner to permit the earnings and profits to accumulate. Therefore, the Teeple case, supra, is not apposite. We conclude that the petitioner has permitted its earnings and profits to accumulate beyond the reasonable needs of its business. Petitioner has not overcome by a preponderance of the evidence the statutory presumption that it was availed of to prevent the imposition of surtax upon its shareholders, and the respondent's determination is sustained. Decision will be entered under Rule 50. Footnotes
1. Sec. 102, Revenue Acts of 1936 and 1938. Sec. 102, Internal Revenue Code. Treas. Reg. 103↩, Sec. 19.102-1-2 and 3.